In re Leslie G. SIMPSON, aka Leslie George Simpson, dba Farmer, Debtor.

WEBSTER CITY PRODUCTION CREDIT ASSOCIATION, Plaintiff,

v.

Leslie G. SIMPSON, Defendant.

Bankruptcy No. 80–03346.
Adv. No. 80–0513.

United States Bankruptcy Court, N.D. Iowa.

April 11, 1983.

Carroll Wood, Webster City, Iowa, for plaintiff/creditor.

Neven J. Mulholland, Fort Dodge, Iowa, for defendant/debtor.

Findings of Fact, Conclusions of Law, and ORDER Denying § 523 Complaint, with Memorandum

WILLIAM W. THINNES, Bankruptcy Judge.

The matter before the Court is the § 523 dischargeability complaint of the Plaintiff/Creditor, Webster City Production Credit Association, against the Defendant/Debtor, Leslie G. Simpson. On October 14, 1981, an order issued from this Court taking the matter under advisement and directing each party to submit a statement of the case and proposed findings of fact. Plaintiff's statement was filed with this Court on November 13, 1981. Defendant's statement was filed August 20, 1982.

The Court, now being fully advised, makes the following Findings of Fact, Conclusions of Law, and Orders:

## FINDINGS OF FACT

1. On November 7, 1980, the Defendant, Leslie G. Simpson, filed a Chapter 7 Petition with this Court. On December 16, 1980, the Plaintiff, Webster City Production Credit Association, commenced this adversary proceeding, objecting to the discharge of the debt owed to it by the Defendant. On January 23, 1981, the Defendant was granted a discharge of all dischargeable debts by Order of this Court.

2. In the spring of 1979, Mr. Larry Ites (hereinafter Plaintiff's agent), then a loan officer of the Webster City Production Credit Association (hereinafter, PCA), contacted the Defendant/Debtor, Mr. Leslie G. Simpson (hereinafter, Simpson), as part of the Plaintiff's loan recruitment campaign known as the "Blitz Program."

3. In June, 1979, Defendant/Simpson contacted Plaintiff's agent at Plaintiff's Clarion, Iowa, office to inquire about new financing for the Defendant's farming operation. On June 26, 1979, Plaintiff's agent, with the aid of Defendant/Simpson, prepared an inspection report concerning various items of Defendant's farm property that was to be collateral for a loan. The agent made a note in the report that he had not seen all the equipment listed.

4. On July 3, 1979, Plaintiff's agent prepared a balance sheet, which Defendant signed, purporting to state the assets and liabilities of the Defendant. The balance sheet was prepared, in part, from the inspection report of June 26, 1979. In addition, the agent prepared a loan application for Defendant's signature. The balance sheet contained at least two errors. Sixty sows were listed as assets, but only 20 were owned by the Defendant. The other 40 were leased. In addition, some machinery was listed that Defendant did not own. The Defendant admitted that the balance sheet was in error on those two points, but insisted that he had informed Plaintiff's agent of the true status of those assets before the balance sheet was prepared. Plaintiff's agent denied any knowledge of such facts. This balance sheet is the basis for Plaintiff's claim under § 523(a)(2)(B).

5. The loan to Defendant was approved by Plaintiff's loan committee, and Defendant executed three notes and a security agreement, all dated July 16, 1979. In return, Defendant was to receive loans totaling $145,942.00, to be disbursed by Plaintiff as needed by Defendant to finance his farming operation and meet living expenses. Plaintiff claims that Defendant promised to obtain clear title to his pickup truck and deliver that title as additional security for the July 16 loans. Defendant denies making such a promise. Plaintiff's agent testified that the loans possibly would have been made even if PCA knew it wasn't going to receive title to the truck. On September 12, 1979, Defendant made an

application for an additional loan and that additional financing was approved by Plaintiff. Plaintiff's agent testified that the loan was approved even though the truck title had not been delivered and proceeds from a sale of sows had not been turned over to Plaintiff as requested. The agent asserted, however, that Plaintiff was still expecting to receive those items, but he could not say that the loan would not have been approved if Plaintiff had known it would not receive the title and hog proceeds. On May 13, 1980, Plaintiff made another loan to Defendant. The note evidencing that indebtedness was signed by Defendant and co-signed by Defendant's father. Disbursements were made pursuant to those loans, from time to time, beginning July 16, 1979, and continuing until about September or October of 1980.

6. During October and November of 1979, the Plaintiff/PCA did not disburse all the sums that had been promised and/or anticipated at the time the loan agreement was made. In one instance during November, 1979, the Plaintiff/PCA did issue a check to Defendant Simpson for nearly $10,000, but Plaintiff subsequently stopped payment on that check, with the result that many checks issued by the Defendant were returned for insufficient funds. The Plaintiff apparently stopped disbursements during October and November because of its concern for its security position and because it wanted the Defendant to provide additional security for the outstanding loan.

7. On a number of occasions, Defendant sold livestock or crops that were covered by Plaintiff's security interest, and retained the proceeds for his own use. Defendant apparently used those proceeds to meet living expenses and pay bills associated with his farming operation. Whether that action was necessary because Defendant was not a good businessman or (at least in part) because Plaintiff withheld promised funds, is unclear on the record before the Court. The proceeds from some livestock and crops sales were paid to the Plaintiff. It is unclear from the facts before the Court whether all the proceeds actually paid were voluntarily remitted by the Defendant, but

he apparently made some good faith efforts to repay the loan.

8. Evidence presented at trial revealed that at least by September 12, 1979, Plaintiff was aware of possible problems in regards to its loan to the Defendant. Subsequently, many balance sheets, loan applications, and inspection reports were prepared, but no further loans were made to Defendant after September 12, 1979, until May 13, 1980, when Defendant's father co-signed a note. Mr. Steven Stahly, President of Plaintiff/PCA, testified that a balance sheet of March 4, 1980, was submitted by the Defendant, but Mr. Stahly believed that it was inaccurate and the PCA neither relied upon it nor made any loan at that time. He also testified that a balance sheet submitted on December 6, 1979, had impressed him as being unsound. On February 4, 1980, Defendant gave Plaintiff a mortgage on certain real property that Defendant had acquired. The mortgage was apparently given as additional security for the existing loans, and probably delayed foreclosure proceedings by the Plaintiff.

9. The Plaintiff admitted that the May 13, 1980, loan was made to the Defendant to improve its security position on Defendant's outstanding loan balance. The Defendant gave the Plaintiff a security interest in all 1980 crops, and agreed that all proceeds from those crops would be applied to the current and past loans. In addition, Plaintiff required the signature of Defendant's father as surety for the loan, and Plaintiff apparently would not have made the loan without the signature of a co-signer.

10. The Plaintiff's reliance on the July 3, 1979, financial statement was not clearly reasonable, given the other facts known or available to the Plaintiff. Further, the Defendant did not clearly intend to deceive the Plaintiff when he gave Plaintiff the July 3, 1979, financial statement.

11. The Defendant willfully and maliciously converted grain (of a value of $1,200.00) in which the Plaintiff had an interest, by his sale of that grain in November of 1980. The Defendant did not, how-

ever, both willfully and maliciously convert any other property in which the Plaintiff had an interest.

## CONCLUSIONS OF LAW

1. Any promises the Defendant may have made, regarding the security he would provide for the loan made by Plaintiff, were not false representations or false pretenses under 11 U.S.C. § 523(a)(2)(A).

2. Plaintiff did not show by clear and convincing evidence either that it reasonably relied on Defendant's financial statement or that the Defendant intended to deceive Plaintiff by use of a financial statement.

3. Plaintiff proved by clear and convincing evidence that the Defendant willfully and maliciously converted grain, in the amount of $1,200.00, in violation of § 523(a)(6), and that Defendant should not be discharged from that particular debt.

4. Plaintiff did not show by clear and convincing evidence that Defendant's conversion of other secured property was a willful and malicious act committed with the intent to harm the Plaintiff.

5. Plaintiff's claim should be denied, and the Defendant's debt declared dischargeable except for the grain conversion in the sum of $1,200.00.

## ORDERS

IT IS THEREFORE ORDERED that Plaintiff's § 523 dischargeability complaint be sustained in part, and that Defendant's debt is nondischargeable to the extent of $1,200.00.

IT IS FURTHER ORDERED that Plaintiff's Complaint is denied in all other respects and is dismissed.

IT IS FURTHER ORDERED that Defendant's debt, except as heretofore declared nondischargeable, is included in the effect of the discharge that has been granted by this Court.

## MEMORANDUM

The Creditor, Webster City Production Credit Association (hereinafter, PCA), is seeking to have the debt owed to it by the debtor, Leslie G. Simpson (hereinafter, Simpson), declared nondischargeable. In support of its dischargeability complaint, the PCA alleges that the debtor, Simpson, violated three different subdivisions of 11 U.S.C. § 523.

The Plaintiff's complaint places three issues before the Court: (1) did the debtor's promise to deliver certificate of title to the PCA constitute a violation of 11 U.S.C. § 523(a)(2)(A)? (2) Did the debtor's false financial statement constitute a violation of 11 U.S.C. § 523(a)(2)(B)? (3) did the debtor's sale of certain encumbered property constitute a violation of 11 U.S.C. § 523(a)(6)?

The Bankruptcy Reform Act of 1978 provides in 11 U.S.C. § 523(a)(2) that:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

.    .    .    .    .

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; or

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

Section 523(a)(2) divides all statements into two mutually exclusive categories. 124 Cong.Rec. H11,096 (1978); 124 Cong.Rec. S17,412 (1978). Statements concerning the debtor's financial condition are governed by subsection (B). Representations not concerning the debtor's financial condition

must be considered under subsection (A). *In re Bedard,* 19 B.R. 565 (Bkrtcy.E.D.Pa. 1982); 3 *Collier on Bankruptcy* ¶ 523.08 (15th ed. 1982).

■ Section 523(a)(6) declares nondischargeable any debt "for willful and malicious injury by the debtor to another entity or the property of another entity." The phrase "willful and malicious injury" includes willful and malicious *conversions.* 3 *Collier* § 523.16 at 523–117.

For the reasons analyzed in more detail below, the Court concludes that all debts owed by Defendant/Simpson to Plaintiff/PCA are dischargeable except for $1,200.00. That amount represents the value of the grain sold by Defendant in November, 1980. The Court believes that the Plaintiff has produced clear and convincing evidence to show that the Defendant converted the grain willfully and with the malicious intent of injuring the Plaintiff. As regards the other acts of conversion, the Plaintiff did not produce clear or convincing evidence of the Defendant's intent or of the extent of the harm, if any, suffered by the Plaintiff. Therefore, those acts cannot support a claim under § 523(a)(6).

Plaintiff's claim based on false representations cannot stand because the alleged false representations are mere promises. Plaintiff's claim based on false financial statements also cannot stand. Many financial status documents were submitted by the Defendant, but only the July Balance Sheet and Loan Application were given before the Plaintiff, by its own admissions, was aware of possible errors in the Defendant's reporting of assets and his failure to pay over proceeds. Because of that awareness, it would have been unreasonable for the Plaintiff to have relied upon documents submitted by ·the Defendant after that time. Therefore, only the July. Balance Sheet will be considered for analysis under § 523(a)(2)(B). None of the other documents add any relevant facts to the issues involved. In addition, the July balance sheet is the strongest evidence for Plain-

tiff's position. If it cannot support Plaintiff's claim, none of the others would be able to do so. Further, the Defendant has cast considerable doubt upon the claim that he Defendant intended to deceive the Plaintiff by use of false financial statements.

The Plaintiff had the burden of proving by clear and convincing evidence each element of its claim under § 523(a)(2)(B). That standard is somewhat greater than a mere preponderance of the evidence, but the testimony and other evidence presented leaves the credibility question in equilibrium. The Court has no reason to place greater weight with the Plaintiff than with the Defendant. Because there is no basis for believing one party more than another, the Plaintiff may not prevail.

I.  *Failure to Deliver Truck Title*

The Plaintiff's first claim for non-dischargeability is that Simpson violated 11 U.S.C. § 523(a)(2)(A). Plaintiff alleges that certain monies were advanced to Defendant partly upon the Defendant's oral promise to secure clear title to his 1979 Ford ¾-ton truck and deliver that title to Plaintiff as partial security for Plaintiff's loan. Defendant contends the promise was not made.

■ It is undisputed that the promise, if made, was not performed. A failure to perform some promised action, however, is not a violation of 11 U.S.C. § 523(a)(2)(A). There is a three-pronged test for violation of § 523(a)(2)(A): (1) Does the alleged violation constitute a false representation? (2) Does the alleged violation constitute false pretenses? or (3) Does the alleged violation constitute actual fraud?

■ To constitute a false representation[1] under § 523(a)(2)(A), a statement must falsely purport to depict current or past facts. *In re Buttendorf,* 11 B.R. 558 (Bkrtcy.Vt.1981); *Matter of Shepherd,* 13 B.R. 367 (Bkrtcy.S.D.Ohio 1981); Defendant did not state that he had clear title to the

---

1.  This Court has exclusive jurisdiction to determine the meaning of "false representations" without referring to state law. *Matter of Pappas,* 661 F.2d 82, 86 (7th Cir.1981).

truck. In fact, Plaintiff's own allegations show that Defendant merely promised to obtain clear title. Any utterance that promises future action certainly does not purport to depict current or past facts. A similar analysis applies to whether the Defendant's statement was a false pretense.[2] Therefore, the Defendant's statement, if made at all, cannot be a false representation or false pretense for purposes of § 523(a)(2)(A).

▮ To prevent discharge for fraud under § 523(a)(2)(A), Plaintiff must prove *actual fraud and not merely fraud implied in law*. *In re Montbleau,* 13 B.R. 49 (Bkrtcy.D.Mass.1981); *In re Alverez,* 13 B.R. 571 (Bkrtcy.S.D.Fla.1981). The elements of actual fraud, also known as common law deceit, have been described by numerous courts. Those elements are:

1. That the debtor made the representations;

2. That at the time made, the debtor knew the representations to be false;

3. That the representations were made with the intention and purpose of deceiving the creditor;

4. That the creditor relied on such representations; and

5. That the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*In re Vissers,* 21 B.R. 638, 639 (Bkrtcy.E.D. Wis.1982); *In re Roberto's, Inc.,* 18 B.R. 551, 554 (Bkrtcy.S.D.Fla.1982); *In re Witt,* 13 B.R. 848, 850 (Bkrtcy.W.D.Va.1981). The plaintiff bears the burden of proving each element by clear and convincing evidence. *Vissers,* 21 B.R. at 639; *In re Tomeo,* 1 B.R. 673 (Bkrtcy.E.D.Pa.1979).

▮ Actual fraud encompasses any "deceit, artifice, trick or design . . . used to cheat another—something said, done or omitted with the design of perpetrating . . .

a cheat or deception." Black's Law Dictionary, 595 (rev. 5th ed. 1979). Defendant's promise, technically, could be fraud as defined above, but the legislative history of the Bankruptcy Act[3] and case law indicate that proof of actual fraud requires a showing of moral turpitude or intentional wrong. 3 *Collier on Bankruptcy,* ¶ 523.08[5], at 523–48 to 49 (15th ed. 1979). It is also a well-established principle that statements purporting to depict a future factual situation cannot be the basis for fraud; similarly, "mere promises, though false and intended to deceive" cannot support a finding of actual fraud. *In re Boese,* 8 B.R. 660, 662 (Bkrtcy. D.S.D.1981); *In re Brooks,* 4 B.R. 237, 238 (Bkrtcy.S.D.Fla.1980).

▮ If the foregoing analysis had determined that Defendant's statement were false pretenses, false statements, or actual fraud, the Plaintiff still could not prevail because Plaintiff has failed to show by clear and convincing evidence that, by uttering the alleged false statements, the Defendant obtained any property, money, or services. Plaintiff's own witness testified that the loan possibly would have been made even if Plaintiff had known that Defendant would not deliver title to the truck as security. Although the creditor need not prove it relied solely on a particular misrepresentation, the creditor must show that the alleged misrepresentation would have made a difference. *In re Drewett,* 13 B.R. 877, 880 (Bkrtcy.E.D.Pa.1981) (*citing, In re Barlick,* 1 B.C.D. 412 (D.R.I.1974)). Plaintiff failed to make that showing. Consequently, Plaintiff's objection to discharge cannot be sustained under § 523(a)(2)(A).

## II. *False Financial Statement*

The Plaintiff's next objection to dischargeability is that Defendant violated the provisions of 11 U.S.C. § 523(a)(2)(B). Plaintiff alleges that a balance sheet pur-

---

2. False pretenses are generally defined as ". . . a false representation of a material *present* or *past fact* . . . ." (emphasis added) Black's Law Dictionary 541 (Rev. 5th ed. 1979).

3. Section 523(a)(2) of the Bankruptcy Code superseded § 17a(2) of the Bankruptcy Act, but case law applying § 17a(2) may be used in interpreting the scope of § 523(a)(2). 3 Collier on Bankruptcy, ¶ 523.07, at 523–33 (15th ed. 1979).

porting to show Defendant's financial condition as of July 3, 1979, was submitted to the Plaintiff by the Defendant; that the balance sheet was materially false; that the Defendant knew it was false; that the Plaintiff relied upon that statement in granting Defendant a loan; and that the Defendant submitted the false balance sheet with the intention of deceiving the Plaintiff. Plaintiff specifically alleges that the Defendant listed 60 sows as assets, only 20 were owned, and 40 were leased. Plaintiff also alleges that certain machinery and equipment was listed as owned when, in fact, it was owned by another person. Plaintiff alleges that Defendant's assets were overstated by at least $30,000. Defendant doesn't deny that the balance sheet was incorrect in that regard, but he claims that Plaintiff's agent knew the true factual situation when that agent prepared the balance sheet for Defendant's signature. •

Section 523(a)(2)(B) first requires that the statement be in writing and that it be a statement of the Debtor's financial condition. Next, it must be shown: (1) that the statement was materially false, (2) that the creditor reasonably relied upon the false statement, and (3) that the debtor caused the statement "to be made or published with intent to deceive." The concept of publication is the same as in the tort area and generally means to make known to another. 3 *Collier,* at ¶ 523.09[5][a]. The first requirement is clearly met in this case, inasmuch as a balance sheet is a statement of financial position at any given time, and it was in writing and was signed by the Defendant. What must now be determined is whether the other three requirements of § 523(a)(2)(B) were also present.

### 1. *Materiality*

There appears to be no question that a $30,000 overstatement of assets is material in this case because that amount represents approximately 20 percent of the total loan. There should be a point at which a misstated sum would be considered *de minimus,* but relatively small amounts have been held to be material. *Morris Plan*

*v. Parker,* 143 F.2d 665 (D.C.Cir.1944). In the case of the July 3, 1979, balance sheet, Plaintiff has clearly shown the materiality of the false statements.

### 2. *Reliance*

While having shown the material falsity of the balance sheet, Plaintiff now must show that it relied on the false statements in the balance sheet and that such reliance was reasonable. 3 *Collier,* at ¶ 523.09[4], 523–61.

An inference of reliance is created when a financial statement is executed by a debtor in support of a loan application. *In re Whiting,* 10 B.R. 687, 689 (Bkrtcy.E.D. Pa.1981) (citing various cases). That inference may be rebutted, however, by the defendant's testimony, and plaintiff then has the burden of going forward with other evidence and bears the risk of nonpersuasion. *Id.* at 689–90. Since the policy of the Bankruptcy Code is to give debtors a fresh start, the various provisions will be construed strictly against the creditor and liberally in favor of the debtor. *Id.* at 690.

The testimony of Plaintiff's agent regarding preparation of the balance sheet and his reliance on information supplied by the Defendant was controverted by the Defendant. In addition, Plaintiff's own evidence showed that the financial statement of a loan applicant is only one of five factors used in making the lending decision. Consequently, Plaintiff's evidence did not clearly establish that the balance sheet signed by the Defendant was a significant factor in its decision to grant the loan. It is possible, for example, that the other four factors were such that the financial statement became irrelevant to the lending decision. Plaintiff's evidence simply did not address this point.

The reasonableness of Plaintiff's reliance is also questionable. Although the dollar amount of the false statement is not very significant for purposes of determining materiality, it can be important for deciding if reliance was reasonable. One court has held that a $9,000 overstatement of net

worth was not significant for a bank's reliance when the loan amount was $400,000. *In re Schade,* 10 B.R. 115, 117 (Bkrtcy.N.D. Ill.1981). In another case, reliance was found to be reasonable when a large portion of total debts was not disclosed and the bank would not have made the loan if all had been listed. *In re LaRocca,* 12 B.R. 56, 59 (Bkrtcy.W.D.La.1981). If the Plaintiff's figures are accepted at face value, Defendant/Simpson, overstated his net worth by approximately $30,000 in obtaining a loan for approximately $145,000. If considered alone, that amount would tend to support a finding of reasonable reliance. The Defendant, however, has claimed that he told Plaintiff's agent, at the time the balance sheet was prepared, that he did not own the assets which Plaintiff now claims were falsely listed by Defendant. If that claim is true, then the PCA's reliance was unreasonable because it knew that the financial statement was not accurate. Such a "red flag" would make further investigation the only prudent course. *See, e.g., In re Schade,* 10 B.R. at 117; and *In re LaRocca,* 12 B.R. at 59 (Both cases implying that the creditor has a duty to investigate beyond the financial statement, at least, when there is some reason to be suspicious of the debtor's information); *see, also, Matter of Breen,* 13 B.R. 965, 969 (Bkrtcy.S.D.Ohio 1981) (which suggests that the creditor has an affirmative duty to investigate beyond the financial statement even without any "warning signs.") Plaintiff's agent, however, denied that Defendant ever informed him of the true ownership situation.

If the standard of proof in these matters was a preponderance of the evidence, this Court would have to decide whose testimony was more credible. The Plaintiff's burden, however, is to prove each element by clear and convincing evidence. *Drewett,* 13 B.R. at 879. Given that standard, the Plaintiff has failed to prove reasonable reliance. The Plaintiff did make a *prima facie* case for reliance by showing that the financial statement is one of five factors normally considered in the decision of whether to grant a loan. The Defendant, however, rebutted any presumption of re-

liance that may have arisen from Plaintiff's evidence by alleging that Plaintiff's agent was aware of the errors in the balance sheet. *In re Whiting,* 10 B.R. 687, 689–90 (Bkrtcy.E.D.Pa.1981) When the Plaintiff's agent denied any such awareness, the Court was faced with the task of weighing the credibility of the two witnesses. The evidence is in equilibrium with the Court having no basis for placing greater weight on the testimony of either party.

An additional factor weighing against the reasonableness of Plaintiff's reliance is that the Plaintiff made disbursements and additional loans after it became obvious that Defendant's original balance sheet had been in error, and after the Defendant had proved to be less than totally co-operative in his dealings with Plaintiff. This factor alone is certainly not determinative of the issue of reasonable reliance, but it is a strong factor to be considered.

Because the Court finds that the parties have presented equally weighted evidence for and against the reasonableness of Plaintiff's reliance, it cannot be said that Plaintiff has proven reliance by clear and convincing evidence.

### 3. *Intent to Deceive*

As with the issue of reliance, intent to deceive may be presumed from the use of a false statement to procure credit. *In re Tomeo,* 1 B.R. 673 (Bkrtcy.E.D.Pa.1979). 3 *Collier,* ¶ 523.09[5][6] at 523–64, fn. 23. Here again, however, the Defendant/Debtor may rebut the presumption by denying the alleged intent. The Plaintiff then has the burden of going forward and ultimately bears the risk of non-persuasion. *In re Tomeo,* 1 B.R. 673. *See, also In re Whiting, supra.*

Because direct proof of intent (*i.e.,* debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred. *In re Hosking,* 19 B.R. 891, 895 (Bkrtcy.W.D.Wis.1982); *Matter of Rickey,* 8 B.R. 860, 863 (Bkrtcy.M.D.Fla.1981). The debtor cannot overcome

such an inference with an unsupported assertion of honest intent.  3 *Collier,* at ¶ 523.09[5][6], 523–64 to 65.

In the present case, the Plaintiff did present sufficient evidence of the surrounding circumstances to raise an inference of intent to deceive.  The Defendant, however, made certain allegations that, if true, would vitiate the inference.

The Plaintiff's evidence was that Defendant failed to honor his agreement with the Plaintiff, that he continuously failed to apply the proceeds of the sale of crops and livestock to the loan, that he continued to overstate his assets, and that he incurred other debts that hampered his ability to repay the Plaintiff.  The Defendant contends that he made the Plaintiff aware of the true status of his assets, thus making the Plaintiff's reliance on the balance sheet unreasonable and the Plaintiff's assertion of intent to deceive spurious.  In addition, the Defendant alleges that the Plaintiff did not initially require that he refrain from selling secured property or that he pay over the proceeds to the Plaintiff.  Defendant also alleges that it was necessary for him to retain those proceeds because the Plaintiff was not providing the promised funds for him to meet his expenses.

Whether intent to deceive was present is mostly a factual issue.  The court has no basis to place more credibility with the Plaintiff's evidence than with the Defendant's.  The evidence presented by each party, though perhaps understandably self-serving, was of equal credibility on this issue.  The Plaintiff had the burden of proving intent by clear and convincing evidence, and did not meet that standard.  Therefore, the requisite intent has not been established.

The Plaintiff has neither established that its reliance was reasonable, nor shown that Defendant intended to deceive Plaintiff when applying for the loan.  Since each element of § 523(a)(2)(B) must be proven before a debt will be excepted from discharge, the Plaintiff's dischargeability complaint cannot be sustained under § 523(a)(2)(B).

### III.   *Willful and Malicious Conversion*

Plaintiff's final objection to dischargeability is based on 11 U.S.C. § 523(a)(6).  That section exempts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

Hatred, spite or ill-will is not required to support a finding of willful and malicious *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), but the legislative history of the Bankruptcy Code makes it clear that "willful" means deliberate or intentional, and that reckless disregard cannot be the standard.  H.R.Rep. No. 595, 95th Cong., 1st Sess. 363 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 77–79 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.  To be willful and malicious, an act must be wrongful, done intentionally, necessarily produce harm, and without just cause or excuse.  3 *Collier,* at ¶ 523.16[1], 523–120.

The basis for Plaintiff's Complaint under § 523(a)(6) is that the Defendant sold hogs and corn on which the Plaintiff had a security interest without paying-over the proceeds to the Plaintiff.  That action, Plaintiff alleged, was a conversion of Plaintiff's property and the Defendant effected the conversion with the intent to harm the Plaintiff.

In general, a mere technical conversion is not enough to establish a willful and malicious injury.  This liberal rule regarding conversion is deemed necessary to effect the intention of Congress: to afford the honest debtor a fresh start.  *Neal v. Clark,* 95 U.S. 704, 24 L.Ed. 586; 3 *Collier,* at ¶ 523.16[3], 523–127.  Standing alone, the failure to pay-over money received from the sale of secured property is not sufficient to show willful and malicious injury.  *Matter of Graham,* 7 B.R. 5 (Bkrtcy.D.Nev.1980).  Therefore, to be a violation of § 523(a)(6), a conversion must be willful and malicious.

The Plaintiff points to two types of conversion by the Defendant, sale of grain

and sale of hogs, and alleges that those acts were willful and malicious. The Defendant denies that he had any intent to harm the Plaintiff. In addition, the Defendant alleges that the Plaintiff was aware of the sales, and that he was forced to sell the property to meet living expenses. The sale of encumbered property to generate living expenses does not, in itself, establish the intent to harm necessary for a finding of willful and malicious injury. *In re Hodges*, 4 B.R. 513, (Bkrtcy.W.D.Va.1980). In *Hodges*, the debtor sold a stereo, which was subject to the creditor's security interest, to make house payments and purchase food. The Court held that the conversion, although willful, was not malicious because the debtor intended to repay the creditor if possible. Most of Simpson's acts of conversion are similar to that of *Hodges*. His uncontroverted testimony was that he used the money from the sale of hogs to pay living expenses. Further, he continued to make payments on the loan balance. The PCA did introduce some evidence that would tend to rebut Simpson's claims, but neither party has clearly established its claims. Congress not only made the requirements of § 523(a)(6) conjunctive, so that both willful and malicious must be found, but also expressly overruled the *Tinker v. Colwell* standard: that "willful and malicious" can mean "reckless disregard." *See,* H.R.Rep. No. 595, *supra.* Given such clear Congressional intent to limit the applicability of § 523(a)(6), the Court must have clear proof before finding the debt nondischargeable.

In one respect, however, the Plaintiff has provided clear and convincing evidence that the Plaintiff willfully and maliciously converted grain on which Plaintiff had a security interest. In November of 1980, the Defendant sold some grain for $1,200. This sale apparently took place less than 24 hours after Defendant had been informed that one of Plaintiff's officers had been appointed receiver for Defendant's property, and that all harvested grain should be turned over to the receiver. The Defendant offered as excuse for the sale only that he had used the money for expenses.

Clearly the Defendant knew he had no right to sell this grain. Also the Defendant must have known that the use of the $1,200 in proceeds would deprive the Plaintiff of those funds. It appears that the Defendant knew he was about to lose control of his assets, and he took the opportunity to salvage some of those assets for his own use. This sale differs from others on which the Plaintiff relies in at least two important aspects. It has been clearly established that it occurred over the express warning of the Plaintiff not to dispose of assets, and the amount of the sale is not in dispute. More importantly, the Defendant surely knew at this point that he would no longer be paying Plaintiff for the outstanding loan. Therefore, Plaintiff has shown by clear and convincing evidence that this act of conversion gave rise to a debt of $1,200 that should not be dischargeable.

For all other alleged acts of conversion, however, the Plaintiff has not produced direct evidence to show willful and malicious intent. Further, the Plaintiff has neither provided any clear evidence regarding the circumstances surrounding the alleged conversions nor any clear evidence regarding the value of property that was converted.

The Court has serious doubts that the alleged acts of conversion rise to the level of willful and malicious injury.

The Plaintiff has failed to establish its claims under § 523(a)(2) and all but one claim under § 523(a)(6). Therefore, Plaintiff's complaint should be dismissed and Defendant's debt declared dischargeable except for the $1,200.00 debt for which Plaintiff did establish its claim under § 523(a)(6).