In re Jeffrey Alan HOLTZ, Heather
Marina Holtz, Debtors.

FIRST NATIONAL BANK OF
OELWEIN, Plaintiff,

v.

Jeffrey Alan HOLTZ and Heather
Marina Holtz, Defendants.

Bankruptcy No. 85–00059W.
Adv. No. 85–0094W.

United States Bankruptcy Court,
N.D. Iowa.

June 12, 1986.

Dan Childers and David Grinde, Cedar Rapids, Iowa, for debtors.

Sam Anderson, Waterloo, Iowa, for plaintiff/Bank.

FINDINGS OF FACT, CONCLUSIONS OF LAW, and ORDERS Sustaining in Part and Denying in Part § 523/§ 727 Complaint

MICHAEL J. MELLOY, Bankruptcy Judge.

The matter before the Court is the complaint of the First National Bank of Oelwein (Bank) objecting to Debtors' general discharge, and in the alternative, the discharge of various debts. Having reviewed the testimony and briefs of the parties, the Court now makes the following Findings of Fact, Conclusions of Law and Orders pursuant to F.R.B.P. 7052. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(I) and (J).

FINDINGS OF FACT

The Debtors had been customers of the Bank for a number of years. The parties had a working farm credit relationship since 1976. The Bank took a blanket farm security interest in all of Debtors' personal property, including crops, to secure the various loans made by the Bank to Debtors over the years. Late in 1983, Debtor Jeff Holtz and Bank began discussing the possibility of lending Debtors money to cover their farming expenses for the 1984 crop year.

Early in 1984, the Bank, having recently discovered that Debtors' financial condition was deteriorating, began tightening controls in order to protect its security interest in Debtors' property. In February, it required the co-signature of Jeff Holtz's father on one of the outstanding notes, and in addition to asking Debtor for a new blanket security agreement, it required a separate security agreement covering the 1984 crop only. The next month, after discovering a $15,000.00 misrepresentation on Debtors' financial statement, Bank informed

Debtors that all future loan disbursements would be handled on a receipt basis only. In September, Bank sent a letter to a number of local grain elevators, including Westgate Elevator, informing those elevators of Bank's security interest in Debtors' crop and directing the grain elevators to issue checks jointly payable to Bank and Jeff Holtz whenever purchasing grain from Debtors. Another letter informing Debtors of this new procedure was mailed on the same day. Bank also requested its tellers to watch for these joint payable checks and have them endorsed by a bank officer.

The parties had no further contact until December 11, 1984, when Debtor met with one of Bank's loan officers to sign a new financial statement. Noting that Debtors' net worth had plunged dramatically to a negative $112,000.00, the loan officer determined that Debtors' crop yield figures did not correspond with Debtors' projections and yields from prior years. The bank officer felt there was approximately $30,-000 of grain unaccounted for. Jeff Holtz was then forced to admit that he had sold 1984 grain to Westgate Elevator and that the proceeds checks were not made payable jointly to Debtors and the Bank.

Further investigation revealed that three checks from Westgate Elevator had been deposited in Debtors' account at the Bank. Those checks, representing proceeds from the sale of secured grain, were identified as Exhibit "Q" in the sum of $18,126.50, deposited September 25, 1984; Exhibit "T" in the sum of $1,324.67, deposited on October 24, 1985; and Exhibit "V" in the sum of $54,561.65, deposited October 19, 1985. The Bank was not named as a payee on any of those checks and none of the proceeds were applied to Debtors' loans with the Bank. The three checks were used to pay other debts of the Debtors, including a $28,000 rent payment.

The parties met next on December 18, 1984, at the farm of Jeff Holtz's father, Orville Holtz. The purpose of this meeting was to discuss the drop in Debtors' net worth and how it would affect future financing plans. At that meeting the Bank directed Debtors to complete an accounting of all 1984 grain sales and proceeds.

When checking the list of large deposits the next day, the loan officer discovered that $14,661.36 had been deposited into Debtors' checking account on December 18, 1984, the date of the meeting at the Holtz farm. This money came from two checks (Plaintiff's Exhibits "X" and "DD") totalling $14,961.36 issued to Jeff Holtz by Westgate Elevator on November 19, 1984 and December 8, 1984, respectively. The checks represented proceeds from the sale of corn which secured the bank debt.

The Bank immediately telephoned Jeff Holtz to discuss this deposit. Jeff Holtz admitted having sold more grain and stated that he planned to pay rents with the proceeds. No mention had been made of these checks at the meeting of December 11, 1984. Nor were they brought up on December 18, 1984, even though they were deposited that same day. Bank again demanded a complete accounting of everything Debtors had spent since September, 1984. This accounting was due at Bank on December 20, 1984, by 2:00 p.m. Jeff Holtz did go to Bank on December 20, 1984, and provided the loan officer with what he stated to be a full and complete accounting.

Jeff Holtz continued to conceal information concerning the sale of Debtors' secured property. Jeff Holtz had in his possession on December 20, 1984, two checks, Exhibit "Z", dated December 3, 1984, in the sum of $22,298.82, and Exhibit "BB", dated December 4, 1984, in the sum of $18,357.65. These checks also represented proceeds of grain sales. Yet Jeff Holtz did not reveal the existence of those checks at the time the full accounting was to be provided on December 20, 1984. One check was eventually paid to the Bank and applied by Jeff Holtz on the note his father co-signed. The second check was still in Debtors' possession when they filed Chapter 7 on January 11, 1985. That check was applied to the bank debt, post-petition.

The proceeds represented by the five checks deposited in Debtor's account, totalling $88,974.18, were converted to Debtors' use without the consent of Bank.

There is no evidence to show that Debtor Heather Marina Holtz was a participant in the conversion of assets. All of the checks in question were payable solely to Jeff Holtz. Most of the relevant discussion involved Jeffrey Holtz only.

## DISCUSSION

### I. *Willful and Malicious Conversion*

Section 523(a)(6) states that an individual is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." This exception to discharge must be "construed strictly against creditors and liberally in favor of debtors." *In re Simpson*, 29 B.R. 202, 210 (Bkrtcy.N.D.Iowa 1983). A creditor asserting nondischargeability must prove its claim by clear and convincing evidence. *In re Bothwell*, 32 B.R. 617, 618 (Bkrtcy.N.D.Iowa 1983).

■■■ A willful and malicious conversion is an "injury" under § 523(a)(6). *In re Simpson* at 208, citing 3 Collier on Bankruptcy § 523.16. Bankruptcy Courts must look to state law to define conversion. Iowa defines conversion as "the act of wrongful control or dominion over chattels in derogation of another's possessory right thereto [citations omitted]." *Welke v. City of Davenport*, 309 N.W.2d 450, 451 (Iowa 1981).

■■ Bank's right to the proceeds of Debtors' 1984 crop (the property at issue here) existed in the form of a perfected security interest. This right was not waived through any "prior course of dealing" with Debtors. Iowa law states:

Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any iden-

tifiable proceeds including collections received by the debtor.

Iowa Code Section 554.9306(2). The word "otherwise" has been interpreted to include a prior course of dealing between the parties. *Hedrick Savings Bank v. Myers*, 229 N.W.2d 252, 256 (Iowa 1975).

Iowa Code Section 554.1205(1) defines course of dealing as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." The case at bar does not involve an action against the purchaser of the grain itself, therefore, the course of dealing analysis need not be made in respect thereof. However, assuming, *arguendo*, that Bank did waive its lien on the grain, it has nevertheless retained its security interest in the proceeds from the grain. *See, Humboldt Trust and Savings Bank v. Entler*, 349 N.W.2d 778 (Iowa Ct.App., 1984).

There was no bank requirement that Debtors actually apply the proceeds from any sale of grain to their loans. However, over the years they had borrowed from Bank, Debtors would regularly sell their crops and apply the sale proceeds to their notes. This was the "course of dealing" that Bank relied upon in allowing Debtors to sell their crop without obtaining prior permission. In addition, in September of 1984, Bank had mailed two letters, one to Westgate Elevator, and one to Debtors, stating its decision to require all area grain dealers to issue grain proceeds checks jointly to Bank and Debtor Jeff Holtz. While these letters may not have imposed an affirmative duty on Debtors to insure this directive was carried out, they were nevertheless evidence to Debtors that Bank was concerned enough about their debt position to strengthen the control over the proceeds. From these two factors, the Court concludes that Bank maintained its security interest in the proceeds. *See, Entler*, at 783. (Creditor maintained its lien on proceeds notwithstanding the fact that it had not required the issuance of joint pay-

able checks). Jeff Holtz's failure to apply these proceeds to the loans amounted to a conversion.

■ A mere technical conversion, however, does not satisfy § 523(a)(6). Failure to apply the proceeds received from the sale of secured grain, standing alone, is not sufficient to establish willful and malicious injury. *Simpson* at 212. "To be willful and malicious, an act must be wrongful, done intentionally, necessarily produce harm, and without just cause or excuse." *Id.*, citing 3 Collier on Bankruptcy at 523.-16. The statute does not require a finding of spite, hatred, illwill or reckless disregard. *Bothwell* at 618. *See also In re Clark*, 50 B.R. 122 (Bkrtcy.D.N.D., 1985).

■ The question in the instant case boils down to how much, if any, of the proceeds from the 1984 crop were willfully and maliciously converted by Debtors. The presence of "aggravated features" is evidence that debtors conduct was more than a technical conversion. *Matter of Langer*, 12 B.R. 957, 960 (D.N.D.1981) quoting *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). One example of aggravated features is a debtor's deliberate or continued concealment of the conversion. *In re Eisner*, 35 B.R. 86, 88 (Bkrtcy.N.D.Ohio 1983) (in the face of communicated creditor concern over late payments, debtor diverted the funds while concurrently assuring creditor that payments forthcoming). *See also In re Egan*, 52 B.R. 501 (Bkrtcy.D.Minn.1985) (directly supports proposition, but discharge granted on facts).

Another aggravated feature involves the deliberate sale of secured property directly after the creditor asserts his rights to protect it. *In re Simpson*, 29 B.R. 202, 213 (Bkrtcy.N.D.Iowa 1983) (debtor sold property in face of express warning from creditor not to dispose of the collateral because a receiver had been appointed). *In re Clark, supra*, (the debtor had been specifically advised to have the secured creditor's name placed on the proceeds check and failed to do so).

■ The Court concludes in the instant case that Jeff Holtz did willfully and maliciously convert a portion of the proceeds received from the sale of secured corn, thus making the amount of the checks converted nondischargeable. *See Simpson, id.*

Beginning late in 1983, Bank became concerned about Debtors' deteriorating loan situation. In order to better protect its interests in the secured property, it instigated a series of heightened controls. Debtors were informed of these controls and expected to comply with them to assure their effectiveness. Jeff Holtz, however, did not cooperate with Bank. Knowing that Bank had requested Westgate Elevator to issue joint payable checks, he uttered no protest when the proceeds checks were made out to Jeff Holtz alone. At the meeting of December 11, 1984, Jeff Holtz misrepresented the quantity of grain sold, until pressed by the loan officer. Knowing that Bank required a complete and accurate accounting of all grain sold, he volunteered no information about any sales to Westgate Elevator in November or December of 1984. At the meeting with Bank officers on December 18, 1984, knowing that Bank required a detailed listing of the disposition of all proceeds received from the sale of grain, he offered no information on the two checks totalling $14,961.36 that had been deposited with Bank that same day. And, finally, when Jeff Holtz provided the "full accounting", as requested, on December 20, 1984, he still withheld information concerning the two checks in his possession totaling over $40,000.

This string of omissions and misrepresentations by Jeff Holtz leads this Court to conclude that Bank has met its burden of proving that Debtor Jeff Holtz willfully and maliciously converted secured property to his own use. Consequently, the Court finds for Plaintiff on the issue of the dischargeability of part of the debt owed by Debtor, Jeff Holtz, to Bank.

■ Having determined that part of the indebtedness is nondischargeable, the Court must determine to what extent judg-

ment should be entered against Defendant, Jeffrey Alan Holtz. The evidence shows that the total value of secured property converted by Debtor, without Bank's consent, was $88,974.14. However, the evidence also shows that $28,000.00 was used to pay rent. Based upon Iowa law, it is well settled that the landlord's statutory lien against the crop grown on rented land has priority over any consensual lien given by the debtor in the crop grown upon that land. *Corydon State Bank v. Scott*, 217 Iowa 1227 252 N.W. 536, 538–539 (1934); *Dilenbeck v. Security Savings Bank*, 186 Iowa 308, 169 N.W. 675 (1918). Consequently, of the $88,974.18 converted by Debtor, Bank would not have a valid claim as against $28,000.00 of that amount.

This Court has held that the total amount of debt to be declared nondischargeable under § 523(a)(6) for a willful and malicious conversion of secured property equals the amount of property converted by the debtor. *See, e.g., Simpson.* Therefore, deducting the $28,000.00 which represents a prior landlord's lien from the $88,-974.18 of converted property, leaves a net figure of $60,974.18. This is the amount the Court determines to be a nondischargeable debt against Debtor, Jeffrey Alan Holtz.

■ As indicated previously, the Court finds that there is insufficient evidence to show that Debtor, Heather Marina Holtz, was a participant in the activities and conduct which give rise to Bank's nondischargeability claim. Consequently, Plaintiff's complaint to determine the debt to be nondischargeable pursuant to § 523, as against Defendant, Heather Marina Holtz, is denied and the cause of action against her is dismissed.

## II. *Section 727 Discharge*

Section 727(a)(2)(A) of the Bankruptcy Code provides that an individual may not be granted a general discharge if "the debtor, with intent to hinder, delay, or defraud a creditor ... has transferred, removed, destroyed, mutilated or concealed" property of the debtor within a year of the date that the petition was filed. F.R.B.P. 4005 provides that the plaintiff, in this case, Bank, has the ultimate burden of proving an objection to discharge.

■ This Court agrees with the generally held proposition that the conversion of secured property to a debtor's own use is not sufficient to deny discharge pursuant to § 727(a)(2)(A). *See, e.g., In re McCloud,* 7 B.R. 819 (Bkrtcy.M.D.Tenn.1980), *In re Ellefson,* 54 B.R. 16 (Brktcy.W.D.Wis. 1985). Therefore, the Court finds that Jeff Holtz's conversion of proceeds from the sale of grain secured by Bank does not bar Debtors' general discharge under § 727(a)(2)(A).

## CONCLUSIONS OF LAW

1. There is no evidence that Debtor Heather Marina Holtz willfully and maliciously converted secured property in violation of § 523(a)(6) and therefore her debt to Bank should be declared dischargeable.

2. The Bank proved by clear and convincing evidence that Debtor Jeffrey Alan Holtz willfully and maliciously converted grain in the net amount of $60,974.18 in violation of § 523(a)(6) and that he should not be discharged from that particular debt.

3. The Bank did not meet its burden of proving that Debtors should be denied discharge pursuant to § 727(a)(2)(A).

## ORDERS

IT IS THEREFORE ORDERED that Bank's § 523 dischargeability complaint be sustained in part, and that Debtor Jeffrey Alan Holtz's debt to First National Bank of Oelwein is nondischargeable to the extent of $60,974.18.

IT IS FURTHER ORDERED that Bank's complaint against Debtor Heather Marina Holtz is dismissed and that Bank's complaint is denied in all other respects and is dismissed.

Judgment shall enter accordingly.