**In re Gerald W. SHOUP and Lynne C. Shoup, Debtors.**

**John J. HUNTER, Trustee, Plaintiff,**

v.

**Gerald W. SHOUP, Defendant.**

**Bankruptcy Nos. 95–31696, 96–3007.**

United States Bankruptcy Court,
N.D. Ohio,
Western Division.

June 27, 1997.

John J. Hunter, Sr., Toledo, OH, trustee.

Ronald D. Dewey, Toledo, OH, for Defendant.

## MEMORANDUM OPINION
## AND DECISION

RICHARD L. SPEER, Chief Judge.

This cause comes before the Court after Trial on Plaintiff's Complaints to Deny Dis-

charge in two separate adversary cases (Case No. 96–3007 and Case No. 96–3008). The Plaintiff in this case is the Chapter 7 Trustee in this Chapter 7 case. The Defendants in each of these two adversary cases are joint debtors in the related bankruptcy case, and the causes of action are identical in each adversary case. For procedural efficiency, the parties have agreed that the two cases would be tried together. At the Trial, the parties were afforded the opportunity to present evidence and make arguments they wished the Court to consider in reaching its decision. The Court has reviewed the arguments of counsel, exhibits, as well as the entire record. Based upon that review, and for the following reasons, this Court finds that the Debtors' discharge should not be denied.

## FACTS

The facts of this case revolve in large part around the Debtors' (hereafter the "Shoups") transfer of their one-half interest in a trucking business called Tech Trucking, Inc. (hereafter "Tech Trucking"). Mr. Shoup in currently employed at Tech Trucking as a dispatcher. The transfer at issue was not reported on the Shoups' bankruptcy schedules, though it was revealed by the Shoups at the creditors' meeting. The Shoups claim that the failure to report the transfer on their bankruptcy schedules was the result of a hasty bankruptcy filing brought upon by a creditor's execution upon their personal property. The Shoups explain that the bankruptcy petition was filed the same day as the execution, so that they could regain possession of their motor vehicles.

Tech Trucking was previously owned by Dwight and Carolyn Fielding (hereafter the "Fieldings"). On January 1, 1991, the Shoups and the Fieldings entered into a close corporation agreement whereby each individual would own one-quarter of the corporation. All four individuals were identified as members of the board of directors, with Mr. Fielding as President and Mr. Shoup as Vice President, Treasurer, and Secretary. On January 15, 1991, a total of one hundred fifty shares (150) of stock of Tech Trucking were issued to Mr. and Mrs. Shoup, with each receiving seventy-five (75) shares respectively.

The consideration given by the Shoups for the acquisition of one-half of the business was a 1984 Kenworth Tractor. Though it was Mr. Shoup who used the tractor, it was Mrs. Shoup who had purchased it through a lease purchase agreement with Mr. Fielding. It appears that Mrs. Shoup had acquired some equity in the tractor, and this equity was used by the Shoups to purchase half of Tech Trucking. The record does not reveal what equity Mrs. Shoup had in the tractor at the time the Shoups acquired their interest in Tech Trucking.

On August 17, 1991, Erica Lynn Shoup died while in the care of the Shoups. She was the minor daughter of Mr. Shoup and his former spouse, Debbie Lynn Crago. At that time, the Shoups were residing in Texas. On May 4, 1993, Debbie Lynn Crago, personally and as Executrix for the Estate of Erica Lynn Shoup, filed a wrongful death action against the Shoups in the Lucas County, Ohio, Court of Common Pleas.

According to the Shoups, the wrongful death suit as well as litigation in the domestic relations court had been ongoing for some time, when in April of 1995 the wrongful death suit began to draw close to trial. (The trial began on June 12, 1995.) Also in April, their attorney in the state court litigation requested a significant retainer to cover the fees and costs of trial. They had been making relatively small payments to their attorney all along, a few hundred dollars at a time which had drained their savings, so that they were not in a position to pay the Five Thousand Dollar ($5,000.00) retainer the attorney requested. Further, according to the Shoups, they had exhausted loans and gifts of funds for litigation from family members, and had no other choice but to raise the necessary funds through their shares of stock in Tech Trucking.

The Shoups maintain that after discussions with the Fieldings, it was agreed that they would sell their shares of the business to the Fieldings for the sum of Ten Thousand Dollars ($10,000.00). Of the purchase price, the Shoups were to receive only Eight Thousand Dollars ($8,000.00), with the remaining Two

Thousand Dollars ($2,000.00) to be withheld by the Fieldings to pay the costs of having a valuation of the business performed. This valuation was never performed.

The Shoups also explained that it was the intention of the parties that the shares would ultimately be repurchased by the company from the Fieldings. It was only because the company did not have the money to repurchase the stock at that time that it was agreed that the money would be forwarded from the Fieldings personally, and that the stocks would be assigned to them. When the company had the money to repurchase the stocks, it would pay the Fieldings, and the company would redeem the stocks.

Upon a review of the depositions entered as exhibits in this case, this Court finds that though the Shoups were sometimes confused with terminology or details of the foregoing events, they were nevertheless consistent in their testimony through the three separate occasions during which they were deposed in this matter, as well as at trial.

The Shoups have also produced three documents which purport to memorialize this assignment and transfer: (1) the minutes of the board of directors of Tech Trucking held at the home of the Fieldings on April 15, 1995 to discuss the Shoups' financial condition; (2) the minutes of a subsequent special meeting of the board of directors of Tech Trucking held on April 17, 1995 at the offices of Tech Trucking; and (3) a letter dated April 17, 1995, assigning the Shoup's shares of stock to the Fieldings, and appointing the Fieldings as the Shoup's "attorney in fact to effect a transfer of the assigned shares on the books of Tech Trucking, Inc. with full power of substitution in the premises." The minutes were signed by Mr. Fielding as chairmen, and Mr. Shoup as secretary. The letter of assignment was signed by the Shoups. The execution of these documents was not notarized or witnessed by anyone other than the Shoups or the Fieldings. Mr. Fielding testified at trial, and relates a consistent account of the events surrounding this assignment and transfer. Also, Richard E. Wolf, Esq., a partner at the law firm of Spengler Nathanson and the attorney for Tech Trucking, testified that he was made aware of the assignment and the minutes of the Tech Trucking meetings regarding this assignment in the spring of 1995.

Also produced at trial, along with the close corporation agreement, was a share ledger and share journal kept by the attorney for Tech Trucking. It contains entries which this Court believes were an attempt to memorialize the assignment and the July redemption of the certificates by the company. Mr. Wolf testified at trial that the share journal and share ledger were kept by his office.

The Shoups explain that the Fieldings paid them the money in cash at the time the letter of assignment was signed, in April of 1995. At trial, Mr. Fielding explained that he kept large amounts of cash on hand for truck repairs in case there was a breakdown at night, when access to cash from bank accounts would be unavailable. The Shoups claimed that they used Five Thousand Dollars ($5,000.00) to pay their attorney for the trial, and One Thousand Dollars ($1,000.00) as down payment on a new truck for Mr. Shoup. The remainder was used for miscellaneous household items and expenses, including a sizable health insurance payment incurred as the result of Mrs. Shoup's leaving her job at T.J. Maxx, ostensibly due to the stress of the litigation. Upon a review of their bank statements at the creditors' meeting, the Shoups were able to identify a payment, ostensibly for insurance, in the amount of One Thousand Twenty-four and 59/100 Dollars ($1,024.59).[1]

The amount of the loan for the pickup truck purchased by Mr. Shoup after the alleged assignment was Twenty-two Thousand Eight Hundred Eighty-two and 18/100 Dollars ($22,882.18). According to the Shoups, the pickup replaced a 1987 Lincoln Continental with one hundred thirty thousand miles formerly driven by Mr. Shoup. Mrs. Shoup drove and continues to drive a 1987 Mercury Sable, and they had a 1986 Chevrolet Cavalier purchased by Mrs. Shoup's parents for

---

1. The transcripts of the creditors' meeting, continued over three dates, were offered into evidence by the Plaintiff, and admitted without objection.

her children. On Mr. Shoup's loan application for the new truck, he listed his occupation as "owner/dispatcher" of Tech Trucking. This application, and the related loan document, were signed on April 24, 1995.

Mrs. Shoup claims to not keep copies of her canceled checks after she checks them against the bank statement, but she did produce the bank statements at the creditor meetings upon the request of the Plaintiff. The Plaintiff has not asserted that the Shoups failed to provide any bank statements that were requested. At trial, the Plaintiff presented a check written by Mrs. Shoup which was offered as an exhibit in a state court domestic relations action between her and her former spouse. This check, written August 24, 1993, was offered to show that the Shoups kept copies of returned checks, but would not produce them. Mrs. Shoup stated that she had requested the check from the bank at the direction of her attorney, as it was offered in that case to show a medical expense of her daughter. There was a dispute due to her former husband's failure to provide insurance to pay for the medical expense, and that at the direction of her attorney she paid the bill and sought repayment in the domestic relations court. When confronted at trial with the original check produced from the state court case file, Mrs. Shoup testified that she must have saved this one at the request of her attorney.[2] The record does not reveal that the Plaintiff requested the Shoups to obtain copies of the returned checks from the bank, or that the Plaintiff attempted to use other discovery methods to obtain such copies from the bank.

What is of particular concern in this case are the share certificates themselves, which were signed by the Shoups not in April of 1995, but on July 1, 1995. This is shortly after a judgment was entered against the Shoups in the wrongful death suit in the aggregate amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) on June 27, 1995, and shortly before the Shoups' bankruptcy petition was filed on July 11, 1995. The April 15, 1995 minutes show that a July 1, 1995 meeting was scheduled, apparently so that any accounting or legal work

which needed to be done could be completed, and so that the company could pay the Fieldings for the shares at that time, as it was the Fieldings' ultimate intention that the company would repurchase the stocks.

The Plaintiff also presented evidence of a postpetition transfer of property by the Shoups. On August 25, 1995, the Shoups transferred title to the 1986 Chevrolet Cavalier to Stacy Draper, who is Mrs. Shoup's minor daughter by a former marriage. The Shoups contend that the title had been endorsed over to her on June 26, 1995, but that the signed title was not taken to the title agency to have the title transferred until August. From the transcripts of the creditors' meeting, it appears that the title was signed and notarized by the Shoups' bankruptcy counsel on June 26, 1995. The Shoups claim that the car was a gift to Mrs. Shoup's children from their grandparents, and produced a copy of the check written by the grandparents to Jason Draper, Mrs. Shoup's son, in the amount of One Thousand Seven Hundred Fifty-five Dollars ($1,755.00) on July 26, 1993. They also produced a contemporaneous copy of the purchase slip for the car, which reflects a payment in the same amount as the check, and indicates an identification number of this car as reflected on the title. The Shoups explain that the car was purchased for Jason, but was to be kept in Mrs. Shoup's name until he proved himself to be responsible. If at some time he did not want the car, it was to go to Stacy Draper, his sister and Mrs. Shoup's daughter. Mrs. Shoup explained that because Stacy had already proven herself to be responsible, the title was to be transferred into her name. She claims that the title was signed over in June and, due only to inadvertence, was not taken to the title agency until August.

At trial the Plaintiff called two witnesses to show that the Shoups owned some guns and an expensive set of tools, which were not reflected on the Shoup's bankruptcy schedules. The first such witness was a former friend and coworker of Mr. Shoup. He testified at trial that he had visited the Shoups' Maumee, Ohio home and saw a large tool chest and a gun. His memory was scanty,

2. The domestic relations matter was heard on January 11, 1994.

however. Further, he presently was a friend of the mother of the girl whose death was the subject of the wrongful death suit. Further, he was the girl's godfather. He testified that even though he was the godfather, he was not upset when the child died. The other such witness is the son of the first, and also testified that he saw tools at the Shoups' home. These recollections date back to 1991 or 1992. The Shoups maintain that they never had anything more than an ordinary set of household tools, and sold any guns they owned before they moved back to Ohio from Texas in 1992. The Plaintiff also produced a witness who was a former employee of Tech Trucking who testified that Mr. Shoup acted like an owner at a company party after the alleged assignment date. The witness's employment terminated on what appears to be a less than completely amicable basis.

## LAW

The Bankruptcy Code provides in pertinent part:

### 11 U.S.C. § 727. Discharge

(a) The court shall grant the debtor a discharge unless—

(1) the debtor is not an individual;

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(B) presented or used a false claim;

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

## DISCUSSION

Objections to discharge are core proceedings pursuant to 28 U.S.C. § 157(b)(2). Thus, this is a care proceeding.

In his Complaints, the Plaintiff objects to the Shoups' discharge under three sections of the Bankruptcy Code. The Plaintiff alleges that the stock transfer was intended to defraud creditors, and as such the Shoups' discharge should be denied pursuant to § 727(a)(2). At trial, the Plaintiff also spoke of Mrs. Shoup's transfer of the 1986 Chevrolet Caviler to her daughter as an improper postpetition transfer. The Plaintiff also contends that the Shoups' discharge should be denied for the failure to keep or produce canceled checks pursuant to § 727(a)(3). Finally, the Plaintiff alleges that the Shoups should be denied a discharge pursuant to § 727(a)(4) for knowingly and fraudulently making false oaths.

Regarding the false oath claims, the Plaintiff alleges that the Shoups made the false oaths in the following ways: (1) by not reporting the stock transfer on their bankruptcy schedules, (2) by testifying at the creditor's meeting on August 22, 1995, that they transferred the stock in April of 1995, knowing that it was not transferred until July 1, 1995, (3) by testifying at the continued creditor's meeting, that the stock was sold to Tech Trucking in April of 1995, knowing that the April 1995 transfer was to the Fieldings in April of 1995, (4) by testifying at the contin-

ued creditors meeting on September 5, 1995, that one Weber and Company, who were the accountants for Tech Trucking, had performed a valuation on the company, knowing that they had not, and (5) by not including in their bankruptcy schedules the fact that they had transferred certain tools, guns, and a grandfather clock. Each of the Plaintiff's allegations will be addressed in turn.

■ The provisions denying a discharge to a debtor are generally construed liberally in favor of the debtor and strictly against the creditor. *Collier on Bankruptcy*, § 727.01[4], 727–12 (15th ed. rev.Dec.1996), citing *Rosen v. Bezner*, 996 F.2d 1527, 1529 (3rd Cir.1993); *In re Burgess*, 955 F.2d 134 (1st Cir.1992); *In re Mendoza*, 16 B.R. 990 (Bankr.S.D.Cal.1982); *Matter of Terkel*, 7 B.R. 801 (Bankr.S.D.Fla.1980); *Matter of Decker*, 595 F.2d 185 (3rd Cir.1979); *In re Adlman*, 541 F.2d 999 (2nd Cir.1976); *Matter of Jones*, 490 F.2d 452 (5th Cir.1974). Courts have noted that "a total bar to discharge is an extreme penalty." *Collier* at 727–12, citing *Bezner* at 1529. The reasons for denial of a discharge must be real and substantial rather than technical and conjectural. *Collier* at 727–12, citing *Burgess*. However, "while the law favors discharges in bankruptcy, it will not ordinarily tolerate the debtor's intentional departure from honest business practices where there is a reasonable likelihood of prejudice." *Collier* at 727–12, citing *Kentile Floors, Inc. v. Winham*, 440 F.2d 1128 (9th Cir.1971). See also *Matter of Garman*, 625 F.2d 755 (7th Cir.1980) (Case under the Bankruptcy Act, stating that the Act was meant to discharge only the *honest* debtor; should be liberally applied to protect the bankruptcy only where there is no intent to violate its provisions).

### I. The Transfer of the Stock and the Car

■ Under 11 U.S.C. § 727(a)(2), in order for the Plaintiff to show that the Shoups should be denied their discharge, the Plaintiff must prove the following elements:

1) that the act complained of was done within one year before the date of the filing of the petition;

2) that the act was done with actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code;

3) that the act was that of the debtor or a duly authorized agent of the debtor;

4) that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done.

*Collier on Bankruptcy* §§ 727.02, 727–13 (15th ed. rev. Dec. 1996), citing *In re Kessler*, 51 B.R. 895, 898 (Bankr.D.Kan.1985). The finding of actual intent may be inferred based upon circumstantial evidence involved in the transfer of property. *Colliers* at 727–17. The § 727(a)(2) intent requirement is clearly disjunctive, so that only an intent to hinder, or an intent to delay, or an intent to defraud must be proven. *In re Nichols*, 1995 WL 80213 (6th Cir.Tenn.).[3] Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred. *In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987), citing *In re Simpson*, 29 B.R. 202, 211 (Bankr.N.D.Iowa 1983). The preponderance of the evidence standard applies in objections to discharge. *In re Adams*, 31 F.3d 389 (6th Cir.1994). At trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection. Fed. Bankr.Rule 4005.

Regarding the stock transfer, the Shoup's intent to delay, hinder, or defraud is the dispositive element. To show such intent, the Plaintiff points to the factors listed in *In re Schroff* 156 B.R. 250, 254 (Bankr.W.D.Mo. 1993), and the fact that the actual stock certificates were signed on July 1, 1995, shortly before the July 11th petition date and after the large judgment had been rendered against the Shoups. The Shoups have explained the stock transfer as detailed supra,

---

**3.** For purposes of this opinion, any discussion of fraudulent intent is meant to reference this § 727(a)(2) disjunctive phrase, incorporating in-tent to hinder, intent to delay, or intent to defraud.

and have shown the documents which support the transfer, though the signatures on the documents were not witnessed by anyone other than the Shoups or the Fieldings.

Along with the July 1st signature on the stock certificates, the Plaintiff has presented other evidence to show that the transfer was indeed done with the intent to hinder, delay, or defraud creditors. The evidence which warrants discussion includes: the fact that the proceeds of the sale were allegedly paid in cash, the fact that Mrs. Shoup did not produce copies of canceled checks from the Shoups' personal checking account, the fact that Mr. Shoup listed himself as "owner/dispatcher" on the application for the new truck on April 24, 1995, the fact that there was a Two Thousand Dollar ($2,000.00) deduction from the proceeds of the sale of the stock to pay for a valuation which was never completed, the fact that a valuation of the business was not performed, the fact that the Shoups listed a Ten Thousand Dollar ($10,000.00) capital gain on their tax return when they actually received only Eight Thousand Dollars ($8,000.00), the fact that Mr. Shoup purchased a new truck, and the alleged inconsistencies in the Shoups' testimony at the various § 341 creditors' meeting dates and at trial.

Each of the foregoing will be addressed in turn. Further, the Plaintiff appears to assert either that the transfer did not occur in April, and the documents are forgeries, or that it did occur in April, but was done with the intent to defraud creditors. This Court will first address whether the sale of the stock did in fact occur in April, then consider whether there is a grounds for denial of discharge if the sale of stock did in fact occur in April.

It is the July 1st transfer of the stock which is the greatest cause for concern in this case. The assignment of valuable property just days before filing bankruptcy certainly creates a justifiable suspicion of deception. However, as explained supra, the Shoups have produced three documents to show that the transfer did in fact take place in April. If the Shoups took the risk of committing the crime of bankruptcy fraud by forging these documents, punishable as a criminal offense under Title 18 of the United States Code, this Court does not know why they would not have predated their signatures on the stock transfers as well. Similarly, Mr. Fielding, who also testified on their behalf risking criminal liability for perjury and bankruptcy fraud, offered consistent testimony. Finally, and perhaps most importantly, Richard E. Wolf, Esq., the attorney for Tech Trucking, testified that he saw the documents in the spring of 1995.

It is entirely plausible that the Shoups could have needed money in April to retain their trial attorney for the wrongful death trial, and that he would require at least a Five Thousand Dollar ($5,000.00) retainer. There was no evidence presented that the attorney did not in fact require and receive such a retainer. Further, it is not implausible that the Shoups would sell or pledge the most valuable asset they owned, the stock in the corporation, in order to pay these costs.[4] Because the corporation was closely held, the Fieldings would be the only likely purchasers or potential creditors who would forward monies based upon these stocks. It is also very plausible that the Fieldings would require the assignment of the stock before forwarding such a sum. Whether the arrangement contemplated was to work as a secured loan that was to be repaid, or as an outright sale of stock with no contemplation of repurchase, an assignment of the stock would effectuate a transfer all the same.

The Plaintiff would also appear to assert that the transfer did not take place in April, and that the documents were forged, because the alleged proceeds of the sale were in cash, and were not directly deposited in their checking account. It is indeed a cause for concern that the proceeds of the sale were paid in cash, and therefore not easily traced. However, the Shoups explained that the bulk of the proceeds of the sale went to pay a

---

4. Prior to the bankruptcy and the state court judgment, the creditor's attorney had done debtors' exams of the Shoups. He was also present and quite active at the extended § 341 examination of the Shoups. There was no evidence offered at trial of other assets of the Shoups which were of a sufficient magnitude to pay the alleged retainer.

Toledo attorney for the costs and fees of the forthcoming wrongful death suit, as well as for the down payment on a truck and for a sizable insurance payment. The Plaintiff has not shown that the proceeds were not so spent, nor has he shown, that such evidence would be available only to the Shoups. Further, the Plaintiff does not allege that the Shoups failed to produce all bank statements that were requested of them, or that copies of canceled checks could not have been requested from the bank, had the Plaintiff requested the Shoups to do so.

Similarly, the Plaintiff argues that the Shoups failed to keep adequate records because they did not keep or produce canceled checks from their personal checking account. Whether this failure to keep records is a basis for denial of discharge in itself falls under a different provision of the Code, and is addressed infra. To the extent it is offered to show that the sale of the stock did not in fact occur in April, this Court does not find it particularly probative. Again, the Shoups appear to have produced bank statements that were requested by the Plaintiff. Further, the Plaintiff did not request the Shoups to obtain copies of a check or checks from the bank.

The Plaintiff also produced a copy of Mr. Shoup's loan application for the truck, wherein Mr. Shoup listed his occupation as "owner/dispatcher" of Tech Trucking. This application was signed on April 24, 1995, just days after the assignment was to have taken place. Though this is a cause for concern, it may reflect more upon the Shoups' ultimate intention to reacquire ownership and not lose control of the business. However, this does not make the assignment documents invalid or fraudulent. It is possible that under the assignment arrangement with the Fieldings, Mr. Shoup contemplated that the transaction would ultimately operate like a loan rather than a sale. However, it is also very likely that the Fieldings would require the assignment document to be signed before they would loan the money, and that the assignment would be valid transfer. Though the false information on the loan application may be grounds for the nondischargeability of the particular debt for the truck, it simply does not rise to the level of warranting a denial of discharge in this case.

■ Based on the evidence before the Court, this Court finds that there is insufficient evidence to prove that the Shoups did not in fact receive the monies that they claim to have received from the assignment of the stock in April, or that the assignment of the stock did not in fact occur in April. This Court will now address whether the assignment was done with the intent to hinder, delay, or defraud creditors.

There is no indication in the record which shows that it was likely that the consideration received for the transfer of the stock was inadequate. Considering that there would be little market for such shares, there is nothing which would indicate that the sale price was inadequate or was done to hinder, delay, or defraud creditors. Further, there was no evidence in the record as to the equity the Shoups had in the trailer they conveyed to the company when they acquired the shares, or what the assets and liabilities of the company currently are, other than the testimony of Mr. Fielding that the company is itself on the verge of bankruptcy. Finally, there was no argument or evidence that the April 17th letter of assignment would be ineffective to assign the shares. Though the fact that the Shoups signed the stock certificates on July 1st no doubt creates a cause for closer examination, if the letter of assignment is valid and enforceable (again there is no evidence that it wouldn't be), then pursuant to its terms Mr. Fielding could have signed the shares on the Shoup's behalf. At trial, Mr. Fielding testified that he had them sign the stock certificates themselves out of an abundance of caution to his interest.

Nor does the Two Thousand Dollars ($2,000.00) that was deducted from the purchase price of the shares ostensibly for a valuation of the business provide significant circumstantial evidence to show the Shoups' intent to hinder, delay or defraud creditors. It appears that the valuation of the stock was Fielding's option, and Mr. Fielding appears to have decided to keep the money in the business. Perhaps it is the Plaintiff's assertion that the fee was added to the purchase price so as to inflate it, thereby reducing the

chances that the adequacy of consideration of the collateral will be questioned. However, there is no evidence that the price with or without the fee was inadequate. Further, the close corporation agreement speaks of a valuation to be performed when the stock is to be sold, and that it is to be done by the corporation's certified public accounting firm. This could explain why the valuation was provided for upon the assignment of the stock.

The Plaintiff also showed that the Shoups claimed the full Ten Thousand Dollar ($10,-000.00) sales price as a capital gain on their tax return, rather the Eight Thousand Dollars ($8,000.00) that they actually received. This Court is not aware how paying more taxes than they had to on the transfer of the stock, if they would be entitled to have claimed less, shows an intent to hinder, delay, or defraud creditors. Any such inference is at best very weak.

The Plaintiff also implies that the Shoup's purchase of the new truck with a One Thousand Dollar ($1,000.00) down payment, ostensibly from the proceeds of the sale of the stock, shows that the Shoups were not in the dire financial condition that they claim. However, the Shoups do not claim that they were in dire financial condition, and that their income was insufficient to cover their ordinary expenses. Rather, they claim that they needed to sell the stock to pay legal costs for the upcoming trial. They claim that their attorney asked for a Five Thousand Dollar ($5,000.00) retainer, which they paid with the proceeds. With the money left over, they had enough to also pay their insurance so that Mrs. Shoup would not have to continue to work, and still had enough for a down payment on a new truck for Mr. Shoup. The Shoups were driving 1987 vehicles. Absent the judgment subsequently rendered against them, there is no indication that the Shoups could not afford the truck payments or that such payments would be unusual considering their income and expenses. The purchase of the truck also does not satisfy the Plaintiff's burden to show the fraudulent intent of the Shoups. Indeed, it could be considered to support the argument that they indeed received the proceeds from the sale of the stock.

The Plaintiff also alleges that there are inconsistencies in the Shoups testimony at the various § 341 creditors' meeting dates and at trial. This Court has reviewed these transcripts thoroughly, and finds that though the Shoups were at times confused and flustered by the creditor's questions, especially with regard to legal terminology, they were nevertheless consistent about the assignment of the stock. For all these reasons this Court cannot find that the Shoups intended to defraud creditors by transferring the stock.

■ The Plaintiff also points to a separate transfer to warrant a denial of discharge, the postpetition transfer of the 1986 Chevrolet Cavalier. As discussed supra, the Shoups contend that the car really belonged to their children, and that the transfer only effectuated this true ownership. Though the Shoups' contention is perhaps erroneous, they have shown evidence for the basis of their belief that the car was in fact purchased as a gift from Mrs. Shoup's parents for her children. Under the facts of this particular case, and considering the relatively minimal value of the car, this Court does not find that the Shoups' error rises to a level whereby they should be denied a discharge.

### II. Failure to Keep or Produce Canceled Checks

The Plaintiff argues that the Shoups' discharge should also be denied under § 727(a)(3), for failure to keep adequate records, or more precisely, canceled checks from their personal account. To sustain an objection to a discharge under section § 727(a)(3) the proof should show either:

● a failure by the debtor to keep or preserve any recorded information, including books, documents, records and papers, or

● an act of destruction, mutilation, falsification, or concealment of any recorded information including books, documents, records and papers by the debtor or someone acting for the debtor; and

- that by failure to keep such books or records or by the act complained of it is impossible to ascertain the financial condition and material business transactions of the debtor.

See *4 Collier on Bankruptcy* §§ 727.03(4), 727–34 (15th ed. rev. Dec. 1996). At trial on complaint objecting to a discharge, the plaintiff has the burden of proving the objection. Fed. Bankr.Rule 4005.

■ During the trial, Mrs. Shoup testified that upon the monthly receipt of bank statements and canceled checks from the bank, it was her normal practice to balance their checking account and then discard the canceled checks. After the § 341 creditors' meeting, the Plaintiff requested that the Shoups provide him with copies of their bank statements for specific months, which they did. In the case of *In re Irey*, 172 B.R. 23 (Bankr.N.D.Ohio 1994), the Court found that maintenance of bank statements without check stubs or canceled checks was sufficient for an individual, non-business debtor. Although the Shoups do have some knowledge of business practice, they should not be held to the standard of a business entity regarding their own personal finances. It would inequitable to deny the Shoups' discharge in this case based upon the failure to keep canceled checks written on their personal checking account. Indeed, many large banks presently do not send canceled checks unless they are specifically requested.

Also, there is not sufficient proof in the record that the Shoups actually did keep canceled checks. The Plaintiff produced a check written on August 24, 1993 that Mrs. Shoup produced on January 11, 1994 in a state court domestic relations case between herself and her former husband to show a medical expense of her daughter. Mrs. Shoup explained that on the advise of her domestic relations counsel, she had paid the medical expense that her former husband was to provide for, and then sought repayment in the domestic relations court. She appeared surprised that the state court file contained the original canceled check, and explained that she must have saved this one upon the direction of her attorney. There was also testimony that Mrs. Shoup had a

book of canceled checks in the truck of her car on one occasion, though this witness appeared to have scanty memories of the details of events surrounding this case and was a friend of the major creditor in this case.

There is simply not enough evidence of wrongdoing here to warrant a denial of discharge in this case. Though Mrs. Shoup could not conclusively explain how the original August 24th check came to be in the state court file, it was produced and offered long before the time period of concern in this case. Also, the record does not show that the Plaintiff ever requested the Shoups to obtain copies of the checks from the bank. This Court declines to deny the Shoups' discharge pursuant to § 727(a)(3).

### III. False Oath Allegations

■ The Plaintiff's allegations that the Shoups should be denied a discharge for making false oaths is brought under § 727(a)(4) of the Bankruptcy Code. Regarding this provision:

A debtor may be denied a discharge by virtue of section 727(a)(4)(a) of the Code if he or she "knowingly and fraudulently, in or in connection with the case made a false oath or account." Section 1746 of title 28, United States Code, provides that in federal proceedings an unsworn declaration under penalty of perjury is a permissible substitute for, and has the same force and effect as, a verification under oath. This is reflected in the Official Bankruptcy Forms, which make provision for unsworn declarations rather than formal verification. Section 727(a)(4)(a) should be read as being equally applicable to such unsworn declarations.

*4 Collier on Bankruptcy* § 727.04(1)(a), 727–36 (15th ed. rev. Dec. 1996) (footnotes omitted). The Court must decide whether the debtor (1) knowingly and fraudulently made a false oath, (2) relating to a material fact. *In re Parsell*, 172 B.R. 226, 231 (Bankr. N.D.Ohio 1994) citing *In re McNamara*, 89 B.R. 648, 654 (Bankr.N.D.Ohio 1988). See also *In re Buck*, 166 B.R. 106, 108 (Bankr. M.D.Tenn.1993) (Plaintiff must establish that the Defendant knew the truth, but nonetheless willfully and intentionally swore to what was false). The Plaintiff has the burden of

proof in this matter. Fed.R.Bankr.P. 4005. The Plaintiff must prove his case by the preponderance of the evidence. *In re Adams*, 31 F.3d 389, 393–94 (6th Cir.1994). Each of the Plaintiff's false oath allegations will be addressed in turn.

### a. Failure to Disclose Stock Transfer in Bankruptcy Schedules

This Court finds that the Shoups did not knowingly and fraudulently make a false oath regarding the failure to disclose the stock transfer in their bankruptcy schedules. In this particular case, the debtors were faced with an enormous debt owed to a single highly motivated creditor who had conducted debtors' exams even before they filed bankruptcy. It is unlikely in the extreme that the Shoups could have believed that they would be able to hide this asset by simply transferring it and then not mentioning the transfer on the bankruptcy schedules. Rather, the record reveals that there was a foreclosure on their personal property on the same day that they filed bankruptcy, and that the records were simply erroneously prepared. Importantly, the Shoups were forthcoming about the transfer at the creditor's meeting. "Filing is often done in haste, without the time for 'reflection' or in depth advice of counsel. In the bankruptcy process, the first meeting of creditors is, in many ways, the moment of 'truth' for the debtors. It appears that the incentive for the debtor to disclose all transfers, or attempted transfers, should continue beyond the filing of the petition." *In re Barney*, 86 B.R. 105, 110 (Bankr.N.D.Ohio 1987).

### b. Shoups' Testimony at the August 22, 1995 Creditors' Meeting That They Sold the Stock in April of 1995 Knowing it Was Not Sold Until July 1, 1995

This Court has already found that the Plaintiff has not met his burden of showing that a transfer did not in fact incur in April.

### c. Shoups' Testimony at the Continued Creditors' Meeting That They Sold the Stock in April of 1995, Knowing that the April Transfer was to the Fieldings

This Court has examined closely the Shoups' testimony on the three dates they were examined under § 341 of the Bankruptcy Code. This Court finds that they have been consistent as to the sale of the stock, though they were sometimes confused by questions or terms. It has consistently been their position that they sold their stock in April, and the Plaintiff has not shown that they did not.

Whether the sale was to the company itself or to the Fieldings who were to be sole owners appears irrelevant, as the Shoups seemed to believe. The close corporation agreement allows for transfers other than to the corporation under certain conditions, one of which is with the consent of the shareholders. The Shoups and the Fieldings represented all of the shares of the company.

### d. Shoups' Testimony on September 5, 1995 at the Continued Creditors' Meeting that Weber and Company had Determined the Value of the Company Knowing that it Had Not

The Plaintiff points to a portion of the § 341 creditors' meeting transcript where Mr. Shoup explained about the Two Thousand Dollar ($2,000.00) amount that was subtracted from the Ten Thousand Dollar ($10,000.00) price that the Shoups and Fieldings agreed to as the sale price of the stocks. The next question was "[a]nd who were the accountants that did this," which assumes that it had been done. Mr. Shoup replied that is was Weber and Company. Weber and Company is the accounting firm for Tech Trucking which was contemplated to do the valuation, had it been done. The Plaintiff then asked when it had been done, Mr. Shoup replied that he did not remember. As discussed supra, a review of the close corporation agreement reveals language which provides for a valuation upon the sale of the company, and that the company's certified public accounting firm was to do it. Very likely, it is from this provision in the corporation agreement that the valuation provision in the assignment arose.

This Court is not convinced that this misstatement was intentional, or that Mr. Shoup was even aware that a valuation had not been

done. The company, or rather the Fieldings, were the ones who retained the money and it appears that it was their option to have a valuation done. Indeed, the valuation was mentioned only in the minutes of the corporation and not the letter of assignment. After the assignment, only the Fieldings owned the corporation to which the minutes applied. It appears that Mr. Fielding lost interest in the idea, and decided to keep the money in the business. Had Mr. Shoup been hiding a valuation that had been done, and it was contrary to his interests herein, then this could be a basis for denial of discharge. However, this is not indicated by the evidence presented.

### e. The Shoups' Failed to Disclose the Transfer or Ownership of Tools, Guns, and a Grandfather Clock

This Court finds that there is insufficient evidence presented to show that the Shoups presently own or recently transferred any guns or a large set of tools, as the Plaintiff contends. Further, there was no evidence presented concerning a grandfather clock. The witnesses' testimony at best only shows that they had these items as recently as 1992. Considering all the circumstances surrounding this issue, this Court is unable to conclude that it provides a basis for denial of discharge.

### IV. Conclusion

Regarding burdens of proof on complaints to deny discharge, it has been observed:

The burden of proof in objecting to discharge is governed by Federal Rule of Bankruptcy Procedure 4005, which state, in full: "At the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection."

The Advisory Committee Note to Rule 4005 states that the rule "does not address the burden of going forward with the evidence." The rule simply indicates that the initial burden of going forward and the ultimate burden of persuasion are on the plaintiff. According to the Advisory Committee, "the rule leaves to the courts the formulation of rules governing the shift of

the burden of going forward with the evidence in the light of consideration such as the difficulty of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the debtor than to the objector."

*Collier on Bankruptcy* §§ 727.03[4], 727–34 (15th ed. rev. Dec. 1996) (footnote omitted). See also *In re Penner*, 107 B.R. 171, 174 (Bankr.N.D.Ind.1989) (Once an initial showing has been made, the burden shifts to the Defendant to demonstrate whether the transfer was justified, but the ultimate burden of persuasion, however, always remains with the plaintiff). Though this Court would have preferred to have seen more evidence surrounding the proceeds of the sale of the stock,[5] this Court does not conclude that such evidence was significantly more accessible to the Shoups than to the Plaintiff, or that the Shoups have not sufficiently explained the transfer. Thus, the Plaintiff has not met his burden of proving that the denial of discharge is warranted.

Though the present Complaints are to the Shoups' entire discharge, it is doubtlessly the Two Million Five Hundred Thousand Dollar ($2,500,000.00) judgment which is primarily at issue. This Court is not aware of any authority under the Bankruptcy Code or case law which would direct the Court to consider the magnitude of a particular debt or debts when determining whether a denial of discharge is warranted. Accordingly, this Court has not considered it, and indeed would not know to whose benefit such a consideration would inure. The Bankruptcy Code provides discharges of indebtedness caused by negligence, and there is sound reasoning behind this policy. The people of the United States, through their Congress, have determined that unless a debt is of a particular type that should render the debt nondischargeable, such as when the debt is caused by willful and malicious injury to another, then that debt will be discharged in bankruptcy so that debtors may get on with their lives and perhaps be productive mem-

---

5. Particularly, this Court would have preferred to have seen testimony of the Shoups' state court wrongful death defense attorney, who allegedly received the bulk of the proceeds of the sale of the stocks.

bers of society. Neither the Plaintiff nor any other creditor has alleged that the Shoups' indebtedness was caused as the result of willfulness or maliciousness, nor has this Court seen any such indication.

What is at issue in this case is not any wrongdoing concerning the facts underlying the state court judgment, but whether the Shoups have done any wrongdoing in connection with this bankruptcy case so severe that the extreme penalty of the denial of their discharge should be imposed. Despite vigorous investigation, such a wrongdoing has not been shown.[6] Accordingly, the Shoups should not be denied their discharge.

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that the Plaintiff's Objection to Discharge of Defendants Gerald W. Shoup and Lynne C. Shoup be, and is hereby, *DENIED*.

---

**6.** As explained supra, the reasons for denial of a discharge must be real and substantial rather than technical and conjectural. *Collier* at 727–12, citing *Burgess*.